DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

NIKHIL BHAGAT (CABN 279892)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7193
    FAX: (415) 436-6982
    nikhil.bhagat@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 16-00259 SI |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| KIA ZOLFAGHARI, | Sentencing Date: January 24, 2020<br>Sentencing Time: 11:00 a.m. |
| Defendant. | Before: The Honorable Susan Illston |

*I'm confident that there are deaths out there that are related to this kind of counterfeiting behavior.*

– Court's Remarks at Sentencing of Candelaria Vazquez, February 9, 2018

**PRELIMINARY STATEMENT**

    The defendant, Kia Zolfaghari, manufactured counterfeit "oxycodone" pills that he sold over the Dark Web. In so doing, he employed a number of individuals, including his co-defendant wife and others. The oxycodone pills the defendant sold to customers were designed to look like the real thing, and were stamped with markings that made them appear to be so. Sold on the dark corners of the Internet, no prescription needed, the pills were aimed at opioid-dependent addicts who could not obtain them through legitimate means. But the pills Zolfaghari manufactured and sold were different from the

real thing in one incredibly dangerous way: instead of oxycodone, they contained a fatal active ingredient: fentanyl. The conduct here was particularly reprehensible because in addition to distributing dangerous drugs, Zolfaghari was defrauding his customers in one of the most perilous ways imaginable: exposing them to unknown amounts of fentanyl, one of the world's most deadly synthetic substances. He did it, of course, for the money: fentanyl was cheaper than using the real thing, and lower production costs meant higher profits.  Mr. Zolfaghari made hundreds of thousands of dollars from this enterprise, spending the money on expensive watches, fancy jewelry, apparel, and an $80,000 car.

The United States Sentencing Guidelines recommend a Guideline range of 248 to 295 months. Given the defendant's leadership role in the conspiracy, his extreme greed, his possession of firearms in furtherance of his drug trafficking activity, the significant public safety risk caused by his conduct, together with his well-planned escape to Mexico and defiance of the Court's orders, the United States requests the Court impose a sentence of 235 months in custody, 13 months below the low end of the applicable Guideline range.

## I. FACTS

Kia Zolfaghari used a pill press to manufacture hundreds of thousands of highly potent, dangerous counterfeit pills which he then sold to addicts on the Dark Web or through a broker named King Edward Harris.  Zolfaghari's wife and co-defendant, Candelaria Vazquez, assisted in this endeavor and shared in the riches it brought, but Zolfaghari was the mastermind behind the operation.  Although the pills were stamped to appear like genuine oxycodone pills, that wasn't so.  Rather, they were laced with fentanyl.  PSR ¶ 12. Fentanyl is a highly potent opiate that can be diluted with cutting agents to create counterfeit pills that attempt to mimic the effects of oxycodone, and can typically be obtained at a dramatically lower cost than genuine oxycodone.  However, small variations in the amount or quality of fentanyl used can have tremendous effects on the potency of the counterfeit pills. *Id.*  Fentanyl has been linked to numerous overdose deaths, commonly by addicts who incorrectly believe that they are ingesting genuine pharmaceutical grade pills containing much less powerful opiates. *Id.*  Zolfaghari knew that the pills contained fentanyl. Plea Agmt. ¶ 2.

In addition, Harris told a confidential source that Zolfaghari sold the drugs to pharmacies, where the pills would presumably be substituted for genuine oxycodone and sold to unsuspecting customers.

Specifically, Harris said, "Like the mother f\*\*kers he [Zolfaghari] deal with, they have pharmacies and stuff and they only call him for the white ones." PSR ¶ 17.

Zolfaghari manufactured and sold these dangerous pills from around May 1, 2014, through his arrest on June 10, 2016. Plea Agmt. ¶ 2. His wife, Vazquez, helped in packaging and mailing the pills and cleaning up. Zolfaghari also employed Vazquez to drop off the parcels for him and used co-defendant King Harris to sell his drugs to customers. *See* PSR ¶ 31. Zolfaghari was the principal operator of the pill press, and was in primary control of the money.

Zolfaghari also had firearms to protect his valuable stash of pills and fentanyl. Zolfaghari carried the Smith & Wesson to a drug transaction on the day of his arrest. On June 10, 2016, Zolfaghari arranged to meet Harris at his and Vazquez's apartment to provide 500 pills for Harris to resell to a customer (who, unbeknownst to Harris, was actually a DEA confidential source). PSR ¶ 26. When Zolfaghari came downstairs to meet Harris outside the apartment, agents arrested him and Harris. Zolfaghari was carrying the Smith & Wesson pistol in his satchel, along with the pills for the transaction. PSR ¶ 27. Agents found Vazquez inside the apartment, where they also found a Glock pistol. *See* Report of Arrest of Kia Vazquez and Candelaria Vazquez and Execution of Search Warrant, June 10, 2016, attached hereto as Ex. A, at 2–4.

As a result of the enormous quantities of pills sold, Zolfaghari created a lavish lifestyle for himself and his wife. Customers paid for pills online in bitcoin, a cryptocurrency, which was converted to cash through PayPal or through unlicensed Bitcoin brokers. Plea Agmt. ¶ 2(f). Zolfaghari and Vazquez would use the cash to purchase gift cards to further conceal the source of the money. (*Id.*) PayPal records show that Zolfaghari received over $400,000 in cash payments during that time, though neither he nor Vazquez had any legitimate income. PSR ¶ 40. PayPal and Amazon records from the period of the drug conspiracy showed numerous purchases for hundreds of thousands of dollars in designer mens and women's clothing, jewelry, and shoes. *See Id.* Once arrested, Zolfaghari and Vazquez skipped bail, fled to Mexico, and remained there for nearly two years, until they were apprehended and returned to the United States. PSR ¶¶ 7, 43.

## II.   THE SENTENCING GUIDELINES

The parties and probation agree on the applicability of the following sentencing guidelines.

First, Zolfaghari is held accountable for between 400 grams and 1.2 kilograms of fentanyl, resulting in a base offense level 30. U.S.S.G. § 2D1.1(c)(5). Because he was a leader/organizer of both his wife, Candelaria Vazquez, and his runner, King Edward Harris, he is assessed an additional two points. *Id.* § 3B1.1. Zolfaghari ran the drug money through a record company and hid it in luxury goods and so was convicted of money laundering, which adds another two points. U.S.S.G. § 2S1.1(b)(2)(B). Because he fled to Mexico during the pendency of his case, he obstructed justice and is assessed an additional two points for that, U.S.S.G.§ 3C1.1, yielding an adjusted offense level of 36. Because the 2016 version of the Guidelines applies,[1] Zolfaghari escapes an additional four-point enhancement for falsely marketing fentanyl as another substance.[2] Finally, because Zolfaghari possessed and carried a firearm during the course of his drug trafficking activity, he was convicted of 18 U.S.C. § 924(c), which requires a 60-month addition to the Guideline range. U.S.S.G. § 2K2.4. With a criminal history category I, the parties agree that Zolfaghari faces a Guideline range of 248 to 295 months.

### III.   STATUTORY SENTENCING FACTORS

Section 3553(a) directs courts to consider a number of factors in determining an appropriate sentence. 235 months is an extraordinary sentence in this District. But this is an extraordinary case. Under the specific circumstances of this case, 235 months is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The law directs the Court to take into account, among other things: the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the need to afford adequate deterrence to criminal conduct, *id.* § 3553(a)(2)(B), the Guidelines range, *id.* § 3553(a)(4), and the need to avoid unwarranted disparities in sentencing. *Id.* § 3553(a)(6).

---

[1] The PSR erroneously provides that the 2018 Guidelines are applicable; rather, because in this case, using the 2018 manual would violate the *Ex Post Facto* clause, the 2016 Sentencing Guidelines should apply. *See* U.S.S.G.§ 1B1.11(b) & cmt. app. n. *See also Peugh v. United States*, 569 U.S. 530 (2013); Plea Agmt. ¶ 7 (defendant's agreement that 2016 guidelines apply).

[2] Under the 2018 Guidelines, a defendant who "knowingly misrepresented or knowingly marketed as another substance a mixture or substance containing fentanyl [] or a fentanyl analogue" receives an increase of four points. U.S.S.G. § 2D1.1(b)(13) (2018). With this addition to the offense level, Zolfaghari would have faced an adjusted offense level of 40, prior to any consecutive guideline for the § 924(c) offense.

**A.    The Incredibly Dangerous Nature of the Offense, the Defendant's Leadership Role in the Organization, and His Possession of a Firearm in Relation to the Offense All Weigh in Favor of a Very Significant Sentence.**

**1.    Fentanyl is a Deadly Substance; Secretly Including it in Pills Marketed as Something Much Less Potent is Unconscionable.**

This is one of the more serious drug trafficking offenses to come before the Court. As the Court recognized in sentencing a co-defendant, "Fentanyl's a killer." Transcript of Proceedings, Sentencing, *United States v. Vazquez,* Feb. 9, 2018, ECF No. 163, attached hereto as Ex. B ("Sent. Tr.") at 10:14. Zolfaghari did not just sell oxycodone illegally. He did not just sell fentanyl illegally. He sold fentanyl *as* oxycodone. Although oxycodone "isn't a wonderful drug . . . fentanyl in lieu of it is very, very dangerous." *Id.* 10:16–10:17. For an opioid addict who has become accustomed to the high she receives from ingesting a certain amount of genuine oxycodone pills, a fentanyl-filled counterfeit is a recipe for overdose. Just two milligrams of fentanyl – the equivalent of two grains of salt –can constitute a lethal dose. *See* Drug Enforcement Administration, Photograph representing fatal dose of fentanyl, available at https://www.dea.gov/galleries/drug-images/fentanyl, attached as Ex. C.

Many fentanyl deaths and overdoses are the result of unsuspecting users who consume a counterfeit pill believing that they are ingesting a much less potent opiate, only to find themselves overdosing from potent effects of fentanyl. According to the Centers for Disease Control, in 2017, there were 28,000 deaths in the United States involving synthetic opioids, a significant increase in 23 states and the District of Columbia from the prior year. According to the CDC, this trend is "being driven by increases in fentanyl-involved overdose deaths, and the source of the fentanyl is more likely to be illicitly manufactured than pharmaceutical." *See* Centers for Disease Control and Prevention, "Synthetic Opioid Overdose Data," *available at* https://www.cdc.gov/drugoverdose/data/fentanyl.html.

If anything, this problem has gotten worse since Zolfaghari's arrest. Although the fentanyl epidemic in the United States was initially centered in the Rust Belt and the East Coast, it has spread to California. Fentanyl overdoses are on the rise. According to the California Department of Public Health, 2018 saw 786 deaths in the state related to fentanyl overdose. *See* Cal. Dept. of Public Health, California Opioid Overdose Surveillance Dashboard, *available at* https://skylab.cdph.ca.gov/ODdash/. In July 2019, at least four people died in San Diego County from counterfeit oxycodone pills like the

ones Zolfaghari sold. Cable News Network, "4 people have died within 24 hours from oxycodone overdoses. Counterfeit pills may be the common link, police say," Jul. 26, 2019, *accessible at* https://www.cnn.com/2019/07/26/us/fentanyl-overdoses-counterfeit-oxycodone/index.html. The government does not possess any evidence tying Zolfaghari to a specific overdose death, but given the nature and extent of his criminal conduct, it stands to reason that "there are deaths out there that are related to this kind of counterfeiting behavior." Sent. Tr. 10:18–10:19.

**2. Zolfaghari's Role in the Manufacture and Distribution of Counterfeit Pills Containing Fentanyl was Much Greater Than That of a Typical Drug Defendant.**

Here, Zolfaghari was the undisputed leader of the drug trafficking operation. He purchased a pill press and used it to manufacture counterfeit oxycodone pills. Plea Agmt. ¶ 2(a). He sold the pills online; his wife and co-defendant Candelaria Vazquez assisted him by packaging and mailing pills as well as cleaning up after him. *Id.* In order to provide another layer of anonymity for his illicit activity, Zolfaghari employed another person to maintain a post office box to receive his fentanyl from overseas. *Id.* He made more than $400,000 from his drug distribution activity and sold at least 13,000 pills. *Id.* Another underling, co-defendant King Harris, acted as an intermediary for sales with certain customers. *See* Plea Agmt. ¶ 2(d).

Moreover, here, Zolfgahari's role is even greater than the typical drug distribution case. In a typical drug trafficking scenario, individuals at each level of the conspiracy have different responsibilities. An organization might manufacture methamphetamine overseas. An individual or group of individuals may perhaps conceal that methamphetamine and smuggle it into the United States. Still others would break it into smaller quantities and transport it into the interior of the United States. Finally, the mid-level dealers would distribute it in even smaller quantities to street-level dealers who sell it to end users. Each of those individuals are culpable and each of those individuals would be guilty of drug trafficking. Here, Zolfaghari did not just cut out the middleman–he took control of the entire process. He played an integral role at—and profited from—every part of the supply chain. He obtained the raw ingredient—fentanyl—from abroad. Using that raw ingredient, he manufactured counterfeit pills, which he and his wife then packaged in his apartment. He then marketed these pills under the anonymity of the Dark Web. He packaged and mailed the orders—fulfillment—with a co-conspirator's

help. Finally, customers paid him directly—in pseudo-anonymous cryptocurrency, Bitcoin. In contrast to a typical drug trafficking defendant, who might only have profited from a small slice of the distribution chain, Zolfaghari enjoyed extravagant profits from every corner, which he then used to live a life of luxury.

### 3. The Defendant Used the Profits from His Dangerous Drug Distribution Empire for Frivolous Luxury Goods.

The nature and circumstances of the offenses—drug trafficking and money laundering—are further aggravated by what Zolfaghari did with the profits from his Darknet drug empire. He did not use his profits to put food on the table or put a roof over his children's head. Rather, further fueled by greed, he used the money to finance a lifestyle of outlandish luxury. He spent $27,487 on a single men's Hublot watch. Plea Agmt. ¶ 2(i). In addition to the Hublot watch, which was made of 18 karat gold, Ex. A at 5, Zolfaghari was in possession of two other watches at the time of his arrest: a $29,000 Audemars Piguet and a five-figure Brietling Avenger with a diamond bezel containing 307 diamonds totaling 14.56 carats. *Id.* He purchased a 2015 Audi RS 5 with his drug money – paying $40,000 down, Plea Agmt. ¶ 2(g), on a car that cost nearly $80,000. Decl. of Nikhil Bhagat ¶¶ 2–3. ("Bhagat Decl."), attached as Ex. D. During the course of the conspiracy, Zolfaghari also purchased a number of high-end fashion items, both for himself and for his wife. *See* PSR ¶¶ 30, 32.

This unrepentant behavior is further exemplified by Zolfaghari's interactions with the sales staff at the high-end fashion boutique Louis Vuitton. On January 8, 2015, Zolfaghari received the following text message:

> Hi Kia this is [redacted] from Louis Vuitton in Union Square. Just letting you know we will be receiving our Trailblazer sneaker in exotic tejus lizard leather in bordeaux and beige. I remembered you enquired about exotic leather sneakers on your last visit. I'll send you pictures of them as soon as they arrive. I'm sure you'll find them amazing. Please let me know if you're still interested so I may reserve your size. Thank you [redacted].

*See* Bhagat Decl. ¶ 4. In response, Zolfaghari asked the salesperson to reserve both colors for him, and he completed the purchase approximately 10 days later. *Id.* ¶ 5. The Trailblazer sneaker, in "exotic tejus" lizard leather, retailed in 2015 for approximately $1,990 per pair. *Id.* ¶ 7.

In an August 2015 text message to the same Louis Vuitton sales representative, Zolfaghari wrote:

> Hi [redacted], hope all is well with you. I saw the boxing sneaker in black on the site, but it said out of stock. So i figure it's not available yet. Can you keep me updated on that and any new trailblazer or other sneaker not out yet please? I bought 3 trailblazers today that were available, but there was one that wasn't. Also the fascination sunglasses in black. If you show me new shoes and sunglasses that I want, I can give you my cc number to buy right away since I don't have a lot of time to go to the store. Unless I already have a similar ready to wear item, I like to try it on before buying, but shoes and sunglasses (most times) I don't need to try. Thank you very much [redacted]. Talk to you later

*Id.* ¶ 6. A Louis Vuitton Boxing Sneaker Boot, which was released in 2015, retailed for $2,250. *Id.* In the above-described message, Zolfaghari told the store representative that he was disappointed that the $2,250 Boxing Sneaker Boot was out of stock, but that he had just purchased three $1,990 Trailblazers and that he was disappointed that a fourth was unavailable. He went on to tell the representative that he was willing to give the representative his credit card number so he could buy sunglasses and shoes right away.

The fact that Zolfaghari spent his profits on maintaining a luxury lifestyle is a significantly aggravating factor weighing in favor of a substantial sentence.

    **B.**    **The Defendant's Flight During Proceedings, Together With His Unaccounted For Wealth, is a Significantly Aggravating Factor and Weighs in Favor of Weighty Punishment.**

Kia Zolfaghari was arrested on the instant charges on June 10, 2016 and appeared before a federal magistrate judge that same day. The Court denied the government's motion to detain Zolfaghari pending trial and released him on a $25,000 unsecured bond, *see* ECF No. 30. Zolfaghari's father co-signed his bond, making him liable for the money as well. One of the conditions of that bond was that Zolfaghari participate in the New Bridge drug treatment program. *See* ECF No. 29. On or about April 1, 2017, Zolfaghari absconded from a sober living environment at New Bridge. Decl. of Joseph Palmer, attached hereto as Ex. E (Palmer Decl.) ¶ 3. On April 5, 2017, the Court revoked Zolfghari's bond. U.S. Mot. for Forfeiture of Bond, Jun. 19, 2017, ECF No. 83 at 2. Two days later, Zolfaghari failed to appear at his change of plea hearing before this Court. *Id.*

Zolfaghari's failure to appear to answer the charges against him was no accident. Rather, it was part of a meticulous plan to evade justice and continue avoiding responsibility for his actions. On April 1, 2017, the same day he left New Bridge, Zolfaghari and his wife, Vazquez, packed suitcases, got in

their car, and drove south from this District to San Diego and across the border to Mexico. Palmer Decl. ¶¶ 4–6. A few days later, they were encountered by Mexican authorities in Sinaloa, well into the interior of Mexico. *Id.* ¶ 6. Zolfaghari and Vazquez told the authorities they were in Mexico for a two-week vacation. *Id.* They ended up staying nearly two years. On February 21, 2019, they were finally captured and returned to the United States. *Id.* ¶¶ 8–9.

The defendant claims poverty. *See* PSR ¶¶ 77–78. He is represented by CJA counsel. *Id.* Yet, he was able to finance nearly two years of living expenses in Mexico City, *see* PSR ¶ 60, in a country where he was living illegally and where there is no evidence he had legitimate employment. This, combined with Zolfaghari's history of cryptocurrency holdings, as well as his familiarity with hiding his identity on the Internet, as well as his admissions that he regularly interacted with untraceable, unlicensed Bitcoin brokers to launder his narcotics proceeds, suggests that Zolfaghari is in possession of additional assets that are yet unaccounted for.

Absconding is a significant sentencing factor the Court should consider when it assesses the "the totality of the circumstances." *Gall v. United States*, 552 U.S. 38, 51 (2007). The Ninth Circuit has routinely held that a decision to abscond is fairly considered in determining an appropriate sentence. *United States v. Thurman*, 749 F.App'x 569 (9th Cir. Jan. 18, 2019) (unpublished) (decision to abscond while on supervised release is appropriate "totality of the circumstances" factor); *United States v. Borquez-Gonzalez*, 727 F.App'x 375 (9th Cir. Jun. 18, 2018) (unpublished) (upholding within Guidelines sentence as substantively reasonable in light of defendant's decision to abscond for two years). *See also United States v. Salazar*, 446 F.App'x 110, 113 (10th Cir. Nov. 9, 2011) (noting, approvingly, "[i]n effect the judge said, because Salazar chose to abscond he would not get lenient treatment.")

Here, the circumstances of Zolfaghari's flight are particularly galling. He abused the Court's trust and jeopardized his father's financial future. He lived abroad with his wife and co-conspirator for more than two years, never intending to return to face the consequences of his actions. His claim that he has "demonstrated appropriate remorse for his conduct *after capture in Mexico and return to [the] district,"* Def.'s Sent. Mem. at 3–4 (emphasis added), proves the point. In evaluating remorse, the Court must square Zolfaghari's words with his actions. Here, he manipulated the actors in the system–the

Magistrate Judge, the District Judge, the surety, the Pretrial Services Office, the New Bridge Foundation, his lawyer, his own father—all in an effort to continue doing what he was doing while conducting his criminal activity—looking out for himself and his own interests. A late-breaking claim of remorse under these circumstances rings hollow. In light of the foregoing, the Court should consider Mr. Zolfaghari's flight a significant aggravating factor.

### C.  The Defendant's History and Characteristics Do Not Suggest a Less Severe Sentence.

The defendant, a man in his 40s, knew right from wrong at the time of his crimes. As described above, he took significant steps to insulate himself from being held accountable for his actions by, among other things, employing others to mail packages on his behalf or conduct face-to-face transactions with customers. He was born in the United States, was raised in a two-parent household, and had "a positive upbringing" PSR ¶ 59. Zolfaghari's family was well-off and his father made good money. *Id.* He was a football player in Danville. *Id.* Unlike many defendants who come before the Court, he did not experience physical, sexual, or mental abuse as a child. *Id.* The defendant characterizes the record as showing "an ability to work at legitimate gainful employment," Def. Sent. Mem. at 3, but the PSR curiously does not reflect a single verified instance of employment since 1996. PSR ¶¶ 71–76. It is true that the defendant has a criminal history category I. This weighs in favor of leniency, but this factor is (1) taken into account by the Guidelines, and (2) less useful where, as here, the defendant's conduct was not aberrational but instead continued over a period of years.

The defendant self-reported significant substance abuse in his 30s. PSR ¶ 67. Ordinarily, the Court would consider substance abuse a mitigating factor, and the government would encourage it to do so. But importantly here, this substance abuse cannot be linked to Zolfaghari's criminal conduct. There is no claim here that Zolfaghari was selling drugs to feed his own addiction. He was selling drugs to maintain his lifestyle–an apartment in one of the most expensive cities in the world, luxury watches, $100,000 cars, and $2000 lizard-leather shoes. It cannot be that simply because a criminal defendant *uses* illegal drugs at the time he operates a sophisticated drug trafficking ring that yielded him hundreds of thousands of dollars in profits, he should receive lesser punishment than one who does not. Here, the record does not demonstrate any tie between Zolfaghari's drug use and his crime. In fact, the only thing

it does demonstrate is that he relied on his drug use to convince a judge to let him out of custody and use the trust placed in him by the New Bridge residential facility to flee the country.

> **D. Zolfaghari's Conduct Took Place on the Dark Web – this Kind of Conduct Demands Special Attention to the Statutory Sentencing Factor of General Deterrence.**

In determining the appropriate sentence, the Court must consider the need for a sentence "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and "promote respect for the law." *Id.* § 3553(a)(2)(A). Zolfaghari primarily sold his wares as a vendor on a marketplace on the the so-called "Dark Web." The Dark Web, also sometimes called the "darknet" or the "deep web," is a colloquial name for a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet that allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web"). These online black-market websites use a variety of technologies, including the Tor network and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. Once a putative customer is able to access a particular Dark Web marketplace, the marketplace appears and operates like any other e-commerce website (such as Amazon.com). *See generally* Indictment, *United States v. Cazes*, No. 1:17-CR-144-LJO-SKO (E.D. Cal. filed Jun. 1, 2017) (describing operation of AlphaBay marketplace on anonymous network); Criminal Complaint, *United States v. Ulbricht*, No. 13-MAG-2328 (S.D.N.Y. filed Sept. 23, 2013) (describing operation of Silk Road marketplace on anonymous network). The very nature of Zolfaghari's criminal conduct–selling drugs over the Dark Web, receiving payment in psuedoanonymous cryptocurrency, and employing others to both receive his illicit raw ingredients and mail his finished product—is inherently difficult to uncover, in part because it is specifically designed to thwart law enforcement detection.

As many courts have recognized, the more difficult a crime is to detect, the more significant general deterrence becomes in sentencing. *See e.g., United States v. Heffernan,* 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it"). The fact that Zolfaghari sold drugs

on the Dark Web is an aggravating sentencing factor.

      **E.**      **The Need to Avoid Unwarranted Disparities in Sentencing Weighs in Favor of a 235-Month Sentence.**

The Court must take care to "avoid *unwarranted* sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (emphasis added). On February 9, 2018, the Court sentenced Mr. Zolfaghari's wife and co-defendant, Ms. Vazquez. In so doing, the Court calculated her Guideline range to be 151 to 188 months. *See* Sent. Tr. at 9. Like Mr. Zolfaghari, Ms. Vazquez had a criminal history category I. *Id.* The Court, taking into account the statutory sentencing factors, decided that a low-end sentence would be appropriate for Ms. Vazquez. *Id.* at 10. Here, the low end of the Guidelines is 248 months. The government's request is 13 months below that. Under these circumstances, granting a 24 percent downward variance for Mr. Zolfaghari, the more culpable defendant, where Ms. Vazquez received a low-end sentence, would lead to a substantially unwarranted disparity in sentencing between Zolfaghari and his co-defendant.

Indeed, throughout the country, individuals who engaged in similar conduct as Mr. Zolfaghari have often been sentenced to sentences in excess of 200 months. For example, in August 2019, a 22 year-old man, Wyatt Pasek, was sentenced to 210 months in custody in the Central District of California. Judgment and Commitment, ECF No. 156, *United States v. Pasek*, No. 8:18-CR-72 (C.D. Cal. Aug. 26, 2019). The government calculated a guideline range of 235 to 293 months.[3] The probation office recommended a sentence of 180 months. Like Zolfaghari, Pasek operated on the Dark Web. Like Zolfaghari, he used fentanyl to manufacture counterfeit oxycodone. Like Zolfaghari, he used the profits from his ventures to buy a five-figure watch and jewelry. Unlike Mr. Zolfaghari, Pasek had previous convictions; but also unlike Mr. Zolfaghari, he was 22 years old and was held accountable for substantially less drugs. *See generally* Gov't Position re Sentencing, *United States v. Pasek*, attached hereto as Ex. F.

In another recent federal case, the defendant, like Mr. Zolfaghari, "manufactured and distributed fentanyl and fentanyl analogue in the form of pills designed to look like oxycodone 30 mg pills." Govt. Sent. Mem. at 2, ECF No. 247, *United States v. Fisher*, No. 8:18-cr-236 (M.D. Fla. Oct. 28, 2019). Like

---

[3] The probation office evidently believed the correct range to be 360 months to life.

Mr. Zolfaghari, Fisher laundered his profits through legitimate businesses and used the money to live a lavish lifestyle with extraordinary cars and jewelry. *Id.* at 3. Like Mr. Zolfaghari, Fisher was the leader of the counterfeit pill conspiracy and had a criminal history category I. *Id.* at 3–4. Unlike Mr. Zolfaghari, Fisher, who was convicted at trial, faced an adjusted offense level of 43, and a guideline range of life. However, unlike Zolfaghari, Fisher was not convicted of a firearms offense. Judgment and Commitment, ECF No. 250, *United States v. Fisher*, No. 8:18-cr-236 (M.D. Fla. Nov. 1, 2019). Fisher was ultimately sentenced to 360 months in custody. *Id.*

### F. The Probation Department's Recommendation Fails to Adequately Consider the Statutory Sentencing Factors.

The Probation Department recommends 188 months. Unfortunately, the justification for this request is untethered from the statutory sentencing factors. First, it fails to take into account the significant harm caused by the defendant's conduct. As described above, it is one thing to sell fentanyl, a deadly drug, to a drug addict who *knows* he is getting fentanyl. It is *wholly another* to distribute that fentanyl to an addict who thinks he is getting a pill the potency of which he is aware. Second, the recommendation fails to adequately take into account Mr. Zolfaghari's aggravated role in the offense, and his use of firearms (in fact, it fails to address either of these factors). Third, it glosses over the defendant's post-arrest conduct, including his flight and imperiling his family member's properties and homes. Fourth, it fails to adequately consider general and specific deterrence, particularly in light of the fact counterfeit oxycodone pills and fentanyl in general are national epidemics and that the conduct here took place on the Dark Web. Finally, as described above, it puts undue emphasis on what it terms an "uncontrolled . . . addiction" without describing how that addiction may have contributed to the offense. For these reasons, the government respectfully suggests that the recommendation in this case should be afforded less weight than it otherwise might be.

//
//
//
//
//

## IV. CONCLUSION

For the foregoing reasons, the Court should impose a total custodial sentence of 235 months, to consist of 175 months in custody as to Counts One and Eleven, to run concurrently, and 60 months in custody as to Count Eight, to run consecutive to Counts One and Eleven. The Court should also impose a term of five years supervised release as to each of Counts One and Eight, and a three year term of supervised release as to Count Eleven, to run concurrently with one another, as well as a $300 special assessment.

DATED: January 21, 2020                                Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____
NIKHIL BHAGAT
Assistant United States Attorney